UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

SHARON WILLIAMS, MARIAH VARGAS, and
MELANIE MARSHALL,

                                                Plaintiffs,

          -against-

THE CITY OF NEW YORK,  DET. SAMUEL
LALLAVE, DET. WALIUR RAHMAN, CAPT.
KENNETH HARSCH, SGT. AFZAL ALI, DET.
CHARLES INGRASSIA, and P.O.s  JOHN and JANE
DOE #1-10, individually and in their official capacities,
(the names John and Jane Doe being fictitious, as the true
names are presently unknown),

                                                Defendants.

----------------------------------------------------------------X

**AMENDED COMPLAINT**

19 CV 4026 (LDH)(VMS)

**JURY TRIAL DEMANDED**

      Plaintiffs SHARON WILLIAMS, MARIAH VARGAS, and MELANIE MARSHALL, by their attorney, ROSE M. WEBER, complaining of the defendants, respectfully allege as follows:

## PRELIMINARY STATEMENT

      1.     Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

## JURISDICTION

      2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

      3.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

4. Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5. Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6. Plaintiff SHARON WILLIAMS is an African-American female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

7. Plaintiff MARIAH VARGAS is an African-American female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

8. Plaintiff MARIAH VARGAS is plaintiff SHARON WILLIAMS' daughter.

9. Plaintiff MELANIE MARSHALL is an African-American female, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

10. Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

11. Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

12. That at all times hereinafter mentioned, the individually named defendants DET. SAMUEL LALLAVE, DET. WALIUR RAHMAN, CAPT. KENNETH HARSCH, SGT.

AFZAL ALI, DET. CHARLES INGRASSIA, and P.O.s JOHN and JANE DOE #1-10 were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

13. That at all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

14. Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

15. Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

**INCIDENT FACTS**

16. On January 25, 2017, at approximately 6:00 a.m., plaintiffs SHARON WILLIAMS and MARIAH VARGAS were lawfully present in the premises known as 23 New Lots Avenue, Apartment 3C, in the County of Kings, in the City and State of New York, and plaintiff MELANIE MARSHALL was lawfully present in the premises known as 23 New Lots Avenue, Apartment 6E, in the County of Kings, in the City and State of New York

17. At aforesaid time and place, defendant police officers broke down the doors of plaintiffs' apartments.

18. Defendant police officers then aggressively entered the apartments, terrorizing plaintiffs.

19. Defendant police officers placed plaintiffs in handcuffs.

20. Defendants searched and ransacked plaintiffs' apartments, remaining therein for approximately one hour and causing extensive damage.

21. Defendants found no contraband in plaintiffs' apartments.

22. Defendants nonetheless placed plaintiffs under arrest, despite defendants' knowledge that they lacked probable cause to do so.

23. Defendants falsely claimed to have recovered narcotics from plaintiffs' apartments.

24. Upon information and belief, defendants raided six apartments in the building simultaneously, without individualized probable cause to do so.

25. Upon information and belief, defendants arrested approximately nine other individuals from the building, without individualized probable cause to do so.

26. Defendants stole cash, a money order, an iPhone, and jewelry from the apartment of plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

27. Plaintiffs were transported to the 73rd Precinct of the New York City Police Department in Brooklyn, New York.

28. While in the transport van, plaintiff MARIAH VARGAS' handcuffs, which evidently had been misapplied, began to tighten up, causing her severe pain.

29. Plaintiffs SHARON WILLIAMS and MARIAH VARGAS repeatedly advised the police officers in the van that Mariah's handcuffs had to be loosened and that she was in pain, but the officers did nothing.

30. As a result of the too-tight handcuffs, plaintiff MARIAH VARGAS experienced severe pain, bruising that lasted approximately two weeks, ongoing chronic pain, and permanent neurological damage.

31. Plaintiffs SHARON WILLIAMS and MARIAH VARGAS were held and detained in custody for approximately eight hours, and plaintiff MELANIE MARSHALL was held and detained in custody for approximately seventeen hours, before being released with Desk Appearance Tickets.

32. At her first court appearance, plaintiff MELANIE MARSHALL accepted an Adjournment in Contemplation of Dismissal.

33. Defendants initiated criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS despite defendants' knowledge that they lacked probable cause to do so.

34. During the period between January 25, 2017 and April 20, 2018, plaintiff SHARON WILLIAMS was required to make numerous court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

35. During the period between January 25, 2017 and September 14, 2017, plaintiff MARIAH VARGAS was required to make numerous court appearances to defend herself in the criminal proceedings that defendants had initiated against her.

36. On or about April 20, 2018, all charges against plaintiff SHARON WILLIAMS were dismissed.

37. On or about September 14, 2017, all charges against plaintiff MARIAH VARGAS were dismissed.

38. As a result of the foregoing, plaintiffs sustained, *inter alia*, physical injuries, mental anguish, shock, fright, apprehension, embarrassment, and humiliation, and deprivation of their constitutional rights.

## MONELL FACTS

39. Both before and after plaintiffs' arrests, a custom and practice of lawlessness and corruption pervaded NYPD narcotics operations.

40. This custom and practice was first exposed in January of 2008, when four officers from Brooklyn South Narcotics were arrested and charged with criminal offenses.

41. In June 2011, Sgt. William Eiseman pled guilty to fabricating narcotics charges and admitted to training young officers to do the same (Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, N.Y. Daily News, June 27, 2011).

42. The on-going custom and practice in making unlawful and fraudulent narcotics arrests was confirmed in October of 2011 in sworn testimony by former NYPD officer Steven Anderson.

43. On May 29, 2013, P.O. Isaias Alicea was convicted of ten felony counts of filing a false document and one misdemeanor count of official misconduct after falsely claiming that he saw two men conducting a drug deal in West Harlem.

44. In August 2013 former NYPD officer Genaro Morales testified that he and other members of his Bronx Narcotics team fabricated stories about narcotics possession and sale (Tara Palmeri & Kirstan Conley, *Cops Lied to Reach Arrest Quotas*, N.Y. Post, Oct. 14, 2013).

45. In 2015, SDNY Judge Engelmeyer suppressed narcotics evidence because of Bronx P.O. Luis Rios' perjury (Josh Saul, *Lying Cop Costs NYPD Big-Time Bust*, N.Y. Post, May 27, 2015).

46. In early 2017, Detectives Sasha Cordoba and Kevin Desormeau were indicted in Queens for lying about the circumstances of narcotics arrests.

47. In October 2017, EDNY Judge Weinstein permitted a *Monell* claim to go forward in a case alleging perjury by narcotics officers, noting that "A reasonable jury may find that this practice is not isolated to a few 'bad' police officers, but is endemic, that NYPD officials are aware this pattern exists and that they have failed to intervene and properly supervise." (*Cordero v. City of New York*, No. 15 CV 3436, 2017 WL 4685544, at *11 (E.D.N.Y. Oct. 17, 2017).)

48. On April 24, 2019, Det. Joseph Franco was indicted for perjury, official misconduct and filing false documents in connection with narcotics cases he was involved in between 2017 and 2018.

49. Upon information and belief, because of the custom and practice of corruption and lawlessness by NYPD narcotics officers, approximately 400 criminal prosecutions had to be dismissed by the Queens County and Kings County District Attorney's Offices.

50. As a direct result of this custom and practice, defendants in the instant matter felt free to arrest plaintiffs without probable cause and to manufacture evidence against them.

51. Both before and after plaintiffs' arrests, NYPD officers were subject to "productivity goals" (i.e., arrest quotas).

52. The existence of the aforesaid custom and practice may be inferred from:

- NYPD Operations Order 52, issued in October 2011, mandating that police officers be evaluated on their activity numbers (including number of arrests) and that officers be disciplined if their numbers are too low; and requiring that NYPD managers set "performance goals" for "proactive enforcement activities" including "self-initiated arrests";

- the directive issued in 2012 by Deputy Chief Michael Marino setting quotas for summonses and arrests (Sean Gardiner, *NYPD Chief Set "Goals" for Officers*, Wall St. J., Mar. 22, 2013);

- the 2006 admission by Deputy Commissioner Paul J. Browne that commanders are permitted to set "productivity goals" (Kareem Fahim, *Police in Brooklyn Used Illegal Ticket Quotas, Arbitrator Decides*, N.Y. Times, Jan. 20, 2006);

- the 2010 admission by Deputy Commissioner Paul J. Browne that police officers are provided with "productivity goals" (*NYPD Officer Claims Pressure to Make Arrests*, http://abc7ny.com/archive/7305356/, Mar. 2, 2010);

- the information provided by whistle-blower police officer Adrian Schoolcraft documenting the existence of arrest quotas (Rocco Parascandola, *NYPD Whistleblower Adrian Schoolcraft Files for Retirement*, N.Y. Daily News, Dec. 4, 2015);

- the information provided by whistle-blower police officer Adil Polanco that commanders relentlessly pressure police officers to make more arrests (*NYPD Officer Claims Pressure to Make Arrests*, http://abc7ny.com/archive/7305356/, Mar. 2, 2010);

- the information provided by whistle-blower police officer Craig Matthews that police are forced to adhere to an illegal quota system, and that he was retaliated against for protesting the quotas (Graham Rayman, *Craig Matthews, Police Officer, Has His Quota Lawsuit Reinstated by Federal Appeals Court*, Village Voice, Nov. 29, 2012);

- audiotapes secretly recorded at the 81st Precinct in 2010, in which precinct commanders threatened police officers about what would happen if they did not meet arrest quotas (Graham Rayman, *The NYPD Tapes: Inside Bed-Stuy's 81st Precinct*, Village Voice, May 4, 2010);

- testimony by P.O. Bryan Rothwell at his departmental trial in January 2014 that police officers in his unit in Brooklyn were required to make at least two arrests per month (Rocco Parascandola, *Brooklyn Cop Testifies That He Was Expected to Make Two Arrests, Issue 20 Summonses Each Month*, N.Y. Daily News, Mar. 6, 2014);

- the facts set forth in the Second Amended Complaint in the class-action *Floyd v. City of New York*, 08 Civ. 1034 (SAS), all of which are incorporated herein, including allegations that NYPD's weekly CompStat meetings put pressure on police officers to engage in behaviors designed to make them appear "productive" (¶ 114); and that NYPD maintains a de facto quota system requiring a certain number of arrests per month, with police officers facing adverse employment consequences for not meeting the quotas (¶ 125);

- Judge Scheindlin's Opinion & Order in *Floyd* dated August 12, 2013, finding *inter alia* that NYPD officers experienced significant pressure to increase their stop-and-frisk activity (p. 64), that senior NYPD officials routinely pressured commanders to increase enforcement activity, and that the pressure was passed down to the rank and file (p. 67-71); and that police officers may suffer adverse employment consequences for not engaging in enough "proactive enforcement activities," including arrests (p. 80);

- the facts set forth in the Complaints in the class-action *Stinson v. City of New York*, 10 Civ. 2248 (RWS), all of which are incorporated herein, including allegations that quota pressure forced police officers to issue bogus summonses and conduct unlawful stop-and-frisks (Graham Rayman, *NYPD Quotas Leading to Civil Rights Violations, New Lawsuit Says*, Village Voice, June 7, 2010);

- the facts set forth in the Complaints in the class-action *Raymond v. City of New York*, 15 Civ. 6885 (LTS), all of which are incorporated herein, including allegations by the twelve police

officer plaintiffs that quotas "absolutely exist," that the burden falls predominantly upon minority neighborhoods, and that police officers who do not meet quotas are punished and subjected to retaliation (*NYPD Still Enforces Illegal Quota System, Minority Officers Allege in Lawsuit*, http://www.nbcnewyork.com/news/local/nypd-quotas-new-york-city-police-department-bill-bratton-edwin-raymond-370118201.html, Feb. 24, 2016);

- a full-page ad in the May 7, 2012 Daily News taken out by the Patrolmen's Benevolent Association, stating that in regard to quotas, "Don't Blame the Cop, Blame NYPD Management";

- testimony in August 2013 by former NYPD officer Genaro Morales that he and other members of his Bronx Narcotics team fabricated stories about narcotics possession and sale because of pressure to meet arrest quotas (Tara Palmeri & Kirstan Conley, *Cops Lied to Reach Arrest Quotas*, N.Y. Post, Oct. 14, 2013);

- the revelation in April 2015 by Anthony Miranda, chairman of the National Latino Officers Association, that anti-crime officers on Staten Island and elsewhere were forced to play a "quota game" in which getting insufficient points for making arrests resulted in adverse employment consequences (Thomas Tracy, *NYPD Accused of Giving Points to Staten Island Cops for Making Arrests to Hit Quota*, N.Y. Daily News, Apr. 1, 2015);

- statements by NYPD Inspector General Philip Eure in April 2015 that NYPD would be evaluating officers based in part upon the number of arrests made (Rocco Parascandola, *NYPD Inspector General Philip Eure Calls for Upgrade of Cop Performance Reviews, Recommends Data-Driven Approach*, N.Y. Daily News, Apr. 21, 2015);

- allegations in January 2016 by P.O. Michael Birch that he was targeted by supervisors for not making enough arrests of minority young people (John Marzulli, *NYPD Cop Claims He Was*

*Punished for Not Stopping Enough Black, Hispanic Teens in Subway*, N.Y. Daily News, Jan. 7, 2016);

- allegations in November 2016 by former P.O. Brendan Cronin that unrelenting pressure to meet arrest quotas drove him to drink (Stephen Rex Brown, *Former NYPD Cop Blames Arrest Quota Pressure for Drunken Shooting Frenzy That Nearly Killed a Man*, N.Y. Daily News, Nov. 25, 2016); and

- allegations in November 2016 by former P.O. Doreen Debattista that she got flak for not making enough arrests (Victoria Bekiempis, *Cop Slaps NYPD Supervisors With $5.5M Discrimination Suit After Allegedly Forcing Her Into Retirement Due To Gender, Age*, N.Y. Daily News, Nov. 23, 2016).

- allegations in November 2018 by Sergeants Benevolent Association president, Ed Mullins, that Capt. Kenneth Noonan threatening to "punch" or "kill" colleagues who "did not adhere to his aggressive quota-driven agenda for arrests and summonses." (Tina Moore & Juan Gonzalez, *NYPD Sergeants Union Plans Protest Against 'Abusive' Staten Island Commander*, N.Y. Post, Nov. 17, 2018).

53. Upon information and belief, as a direct result of these quotas, defendants in the instant matter felt pressure to arrest plaintiffs without probable cause and to manufacture evidence against them.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983**

54. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "53" with the same force and effect as if fully set forth herein.

55. All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

56. All of the aforementioned acts deprived plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

57. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

58. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

59. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

60. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "59" with the same force and effect as if fully set forth herein.

61. As a result of the aforesaid conduct by defendants, plaintiffs were subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

62. As a result of the foregoing, plaintiffs' liberty was restricted, they were put in fear for their safety, and they were humiliated, without probable cause.

### THIRD CLAIM FOR RELIEF
### UNLAWFUL SEARCH UNDER 42 U.S.C. § 1983

63. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "62" with the same force and effect as if fully set forth herein.

64. As a result of the aforesaid conduct by defendants, plaintiffs' home and possessions were illegally and improperly searched without any probable cause, privilege or consent.

### FOURTH CLAIM FOR RELIEF
### MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. § 1983

65. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "64" with the same force and effect as if fully set forth herein.

66. Defendants caused legal process to be issued to enter 23 New Lots Avenue, Apartments 3C and 6E, Brooklyn, New York, and to place plaintiffs under arrest.

67. Defendants entered 23 New Lots Avenue, Apartments 3C and 6E, Brooklyn, New York, and arrested plaintiffs in order to obtain collateral objectives outside the legitimate ends of the legal process.

68. These collateral objectives included, but were not limited to, increasing their job security by meeting "productivity goals" (i.e., quotas).

69. Defendants acted with intent to do harm to plaintiffs, without excuse or justification.

### FIFTH CLAIM FOR RELIEF
### EXCESSIVE FORCE UNDER 42 U.S.C. §  1983

70. Plaintiff Mariah Vargas repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "69" with the same force and effect as if fully set forth herein.

71. The level of force employed by defendants in improperly applying and then refusing to loosen plaintiff MARIAH VARGAS' handcuffs was objectively unreasonable and in violation of plaintiff's constitutional rights.

72. As a result of the aforementioned conduct of defendants, plaintiff MARIAH VARGAS was subjected to excessive force and sustained physical injuries.

### SIXTH CLAIM FOR RELIEF
### MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

73. Plaintiffs Sharon Williams and Mariah Vargas repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "72" with the same force and effect as if fully set forth herein.

74. Defendants misrepresented and falsified evidence before the District Attorney.

75. Defendants did not make a complete and full statement of facts to the District Attorney.

76. Defendants withheld exculpatory evidence from the District Attorney.

77. Defendants were directly and actively involved in the initiation of criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

78. Defendants lacked probable cause to initiate criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

79. Defendants acted with malice in initiating criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

80. Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

81. Defendants lacked probable cause to continue criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

82. Defendants acted with malice in continuing criminal proceedings against plaintiffs SHARON WILLIAMS and MARIAH VARGAS.

83. Defendants misrepresented and falsified evidence throughout all phases of the criminal proceeding.

84. Notwithstanding the perjurious and fraudulent conduct of Defendants, the criminal proceedings were terminated in plaintiffs SHARON WILLIAMS and MARIAH VARGAS' favor on April 20, 2018 and September 14, 2017 respectively, when all charges against them were dismisses.

### SEVENTH CLAIM FOR RELIEF
### DENIAL OF DUE PROCESS VIA FABRICATION OF EVIDENCE
### UNDER 42 U.S.C. § 1983

85. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "84" with the same force and effect as if fully set forth herein.

86. Defendants created false evidence against plaintiffs.

87. Defendants forwarded false evidence to prosecutors in the Kings County District Attorney's Office.

88. Defendants misled juries, judges, and/or prosecutors by providing false testimony and proffering false evidence throughout the criminal proceedings.

89. In creating and forwarding false information to prosecutors, defendants deprived plaintiffs of due process and violated their constitutional right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

### EIGHTH CLAIM FOR RELIEF
### FAILURE TO INTERVENE

90. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "89" with the same force and effect as if fully set forth herein.

91. Each and every individual defendant had an affirmative duty to intervene on plaintiffs' behalf to prevent the violation of their constitutional rights.

92. The individual defendants failed to intervene on plaintiffs' behalf to prevent the violation of their constitutional rights despite having had a realistic opportunity to do so.

93. As a result of the aforementioned conduct of the individual defendants, plaintiffs' constitutional rights were violated.

### NINTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY

94. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "93" with the same force and effect as if fully set forth herein.

95. Defendants arrested and prosecuted plaintiffs and violated their privacy in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said actions would jeopardize plaintiffs' liberty, well-being, safety and constitutional rights.

96. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

97. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

98. The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

   a) wrongfully arresting individuals on the pretext that they were involved in drug transactions and/or illegally possessed drugs;

    b)    manufacturing evidence against individuals allegedly involved in drug transactions and/or in illegally possessing drugs; and

    c)    arresting innocent persons in order to meet "productivity goals" (i.e., arrest quotas).

99. The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department constituted a deliberate indifference to plaintiffs' safety, well-being and constitutional rights.

100. The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by plaintiffs as alleged herein.

101. The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiffs as alleged herein.

102. As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, plaintiffs were falsely arrested and maliciously prosecuted and their home and possessions were unlawfully searched.

103. Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiffs' constitutional rights.

104. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of plaintiffs' constitutional rights.

105. The acts complained of deprived plaintiffs of their rights:

    A.    Not to be deprived of liberty without due process of law;

    B.    To be free from seizure and arrest not based upon probable cause;

      C.      To be free from unlawful search;

      D.      To be free from malicious abuse of process;

      E.      To be free from unwarranted and malicious criminal prosecution;

      F.      Not to have excessive force imposed upon them;

      G.      Not to have summary punishment imposed upon them; and

      H.      To receive equal protection under the law.

106.    As a result of the foregoing, each plaintiff is entitled to compensatory damages in the sum of one million dollars ($1,000,000.00) and is further entitled to punitive damages against the individual defendants in the sum of one million dollars ($1,000,000.00).

**WHEREFORE**, each plaintiff demands judgment in the sum of one million dollars ($1,000,000.00) in compensatory damages and one million dollars ($1,000,000.00) in punitive damages, plus reasonable attorney's fees, costs, and disbursements of this action.

Dated:      New York, New York
                  January 13, 2020

                                                          /s
                                          ROSE M. WEBER (RW 0515)
                                          30 Vesey Street, Suite 1801
                                          New York, NY 10007
                                          (212) 748-3355